# UNITED STATES DISTRICT COURT

### for the
### Middle District of North Carolina

In the Matter of the Search of  )
*(Briefly describe the property to be searched*  )   Case No. 1:24MJ81-1
*or identify the person by name and address)*  )
  )
120 Yester Oaks Way E, Apartment F  )
Greensboro NC 27455  )

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the _____ Middle _____ District of _____ North Carolina _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841 (a)(1) and (b) (1)(C) | Distribution/Manufacturing/Possession with intent to Distribute Controlled Substance |

The application is based on these facts:
See Attached Affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

/s/ Matthew La Valley
_____
*Applicant's signature*

Matthew La Valley, ATF TFO
_____
*Printed name and title*

On this day, the applicant appeared before me via reliable electronic means, that is by telephone, was placed under oath, and attested to the contents of this Application for a search warrant in accordance with the requirements of Fed. R. Crim. P. 4.1.

Date: _____ 02/21/2024    4:10 pm _____

City and state: _____ Durham, North Carolina _____

_____
*Judge's signature*

Hon. Judge Joe L. Webster, U.S. Magistrate Judge
_____
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF APPLICATION

I, Matthew La Valley, Task Force Officer, Bureau of Alcohol, Tobacco, Firearms and Explosive (ATF), Greensboro, North Carolina, being duly sworn, depose and state as follows:

1.      I am a Task Force Officer with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), and have been for approximately three years, as well as a Police Officer with the Winston-Salem Police Department, and have been for approximately nine years.  Your affiant has received local, state, and federal training in the identification and investigation of narcotics. Furthermore, your affiant has made and assisted with more than 200 arrests for narcotic related violations at both the state and federal levels.

2.      This affidavit is submitted in support of an application for a search warrant for the residence located at 120 Yester Oaks Way E, Apartment F, Greensboro, North Carolina; and located within the Middle District of North Carolina.

3.      This has been an ongoing investigation since September 2023. The information contained in this affidavit is based upon information provided by other ATF special agents, ATF task force officer, and other federal, state and local law enforcement officers, public source documents such as police reports, telephone toll analysis, physical surveillance and my own personal investigation.  The information contained in this affidavit is submitted for the sole purpose of

1

establishing probable cause for a search warrant mentioned herein. As a result, it does not contain every fact known to me concerning this investigation. Based upon all of the facts set out in the paragraphs below, I allege the following:

a.) The target of this investigation is engaged in long-term, continuing criminal activities, namely offenses involving the distribution and possession with intent to distribute controlled substances, in violation of Title 21, United States Code, Section 841(a)(1) and Title 21, United States Code 841(b)(1)(c);

b.) The evidence sought through the use of a search warrant listed herein will provide investigators with evidence of these crimes needed to establish the full scope and nature of the offenses being investigated; including determining the identity of additional co-conspirators, the sources of supply, transportation methods, locations used to conceal drugs and the assets purchased from the proceeds derived from the sale of drugs; and,

c.) There is probable cause to believe that such items of evidence, which represent the fruits and instrumentalities of said offenses, will be located within the location specified in this application, which is located within the Middle District of North Carolina.

4. Based upon my training and experience, as well as the other sources of information mentioned herein, I know the following:

a.) that drug traffickers maintain books, records, receipts, notes, ledgers, airline tickets, money orders, pagers, scanners, cellular telephones and other instruments and papers relating to transportation, ordering, distribution, and

2

sale of controlled substances. Further, that drug traffickers commonly "front" (provide on consignment) heroin and other controlled substances to their clients; and that the aforementioned books, records, receipts, notes, ledgers, etc. are maintained where the drug traffickers have ready access to them, including on their persons. Cellular telephones are of evidentiary value with respect to the identification of subjects who have not yet been positively identified;

 b.) that it is common for large scale drug traffickers to secrete contraband proceeds of drug sales, and records of drug transactions, in secure locations within their residences, their automobiles, their businesses and/or on their persons for ready access and to conceal these records from law enforcements.

 c.) that persons involved in large scale drug trafficking conceal within their residences and businesses large amounts of currency, financial instruments, precious metals, jewelry, and other items of value and/or proceeds of drug transactions; and evidence of financial transactions relating to the obtaining, transferring, secreting, or spending of large sums of money obtained as a result of their participation in drug trafficking activities;

 d.) that when drug traffickers amass large cash proceeds from the sale of drugs, the drug traffickers attempt to "legitimize" these profits. To accomplish this goal, drug traffickers utilize domestic banks and their attendant services, i.e., securities, cashier's checks, money drafts, wire transfers, letters of credit, brokerage houses, real estate and also shell transactions, and various business fronts to legitimize their profits made form narcotics trafficking;

3

e.) that drug traffickers maintain names, addresses or telephone numbers in books, ledgers, electronics storage devices or on papers which reflect the names, nicknames, code names, addresses, and/or the telephone numbers of their criminal associates, and may be used to identify coconspirators who have not been identified or located;

f.) that drug traffickers frequently take or cause to be taken photographs or other video images of themselves, their associates, their property, and other items of evidentiary value and that these traffickers usually maintain these photographs and video images in their possessions;

g.) based on my training and experience, unexplained wealth is probative of crimes motivated by greed, in particular, drug trafficking and money laundering;

h.) that drug traffickers frequently maintain fictitious identification and other documents which are intended to conceal their identity and avoid detection by law enforcement, including fictitious driver licenses, passports, photo identification cards, and documents relating to fraudulently obtained vehicle titles, registrations, and insurance;

i.) that drug traffickers frequently store and maintain paraphernalia used for the packaging, diluting, weighing and/or distribution of drugs inside their residence; including, but not limited to: scales, plastic bags, diluting agents, tape, plastic wrap, and other items used to conceal drugs during transportation such as chemical and other odor-masking agents;

4

j.)   that individuals involved in the collection, accounting, packaging, transportation and laundering of drug proceeds often maintain paraphernalia used to perform these tasks, including, but not limited to money counting machines, plastic wrap, bulk quantities of rubber bands, and other items used to conceal drug proceeds such as chemical and other odor-masking agents;

k.)   that drug traffickers most generally have in their possessions, that is, on their persons, in their vehicles, in their residence and/or in their business, firearms, including but not limited to handguns, pistols, revolvers, rifles, shotguns, machine guns, and other weapons. Said firearms are used to protect and secure the drug traffickers' property and persons.  Such property may include, but not be limited to, narcotics, jewelry, narcotics paraphernalia, books, records, and United States currency;

l.)   that drug traffickers often place assets in names other than their own to avoid the detection of these assets by government agencies;

m.)   that drug traffickers often place assets in corporate entities in order to avoid the detection of these assets by governmental agencies;

n.)   that even though these assets are in other persons' names, that drug traffickers continue to use these assets and exercise dominion and control over them;

o.)   that these assets are hidden in order to evade the payment of taxes on income and/or prevent forfeiture in event of prosecution;

5

p.) that large scale drug traffickers must maintain on hand large amounts of United States currency in order to maintain and finance their ongoing narcotics business.

## FACTS ESTABLISHING PROBABLE CAUSE

1. During the month of September 2023, I received information from a confidential, and compensated ATF informant, hereinafter referred to CI 1, regarding William Lamont NORWOOD Jr (2/11/1995) trafficking large quantities of fentanyl and methamphetamine. I have found CI 1 to be credible and reliable from previous investigations. CI 1 gave the phone number for NORWOOD as 336-566-9668. TFO La Valley showed CI 1 a photograph of NORWOOD, who confirmed NORWOOD to be subject CI 1 said was involved in the narcotic trafficking. CI 1 informed me that NORWOOD resides at 120 Yester Oaks Way E, Apartment F, Greensboro NC.



2. TFO La Valley conducted a query of NORWOOD's criminal history, which revealed NORWOOD to have been convicted of multiple felonies, to include Obtain Property by False Pretense (2015CR056648), Obtain Property by False Pretense (2016CR051313), PWISD Schedule VI (2016CRS061249),

6

Possession of Firearm by Felon (2016CRS061249), PWISD Marijuana (2019CRS057489), PWISD Cocaine (2019CRS057489), and Possession of Firearm by Felon (2019CRS057489).

3. On October 18, 2023, TFO La Valley, SA Crocker and TFO Van Kuren met with CI 1 in a pre-determined location and directed CI 1 to respond to 120 Yester Oaks Way E, Apartment F, Greensboro NC to meet with NORWOOD and purchase two ounces of methamphetamine, one ounce of fentanyl and one ounce of heroin. CI 1 was then provided with prerecorded Agent Cashier Funds to conduct the controlled buy for methamphetamine, fentanyl, and heroin.

4. Prior to the operation, CI 1 and the CI vehicle (CIV) were searched by TFO La Valley for contraband with negative results. CI 1 also received a video/audio recording device to capture any interaction CI 1 has with subjects at the aforementioned location.

5. Once assisting officers were in the area of 120 Yester Oaks Way E, Apartment F, Greensboro NC to conduct surveillance, TFO La Valley, SA Crocker and TFO Van Kuren instructed CI 1 to respond to 120 Yester Oaks Way Apartment F, Greensboro NC.

6. After CI 1 arrived at 120 Yester Oaks Way E, Greensboro NC, CI 1 knocked on the front door to Apartment F, which NORWOOD opened and allowed the CI into the apartment. NORWOOD was observed on video surveillance holding a handgun after allowing CI 1 into the apartment.

7



7. The two spoke briefly, during which time CI 1 gave NORWOOD one thousand nine hundred dollars ($1900.00) of prerecorded Agent Cashier Funds and NORWOOD gave CI 1 approximately 57.2 grams of methamphetamine, 29.1 grams of fentanyl, and 29.1 grams of heroin.



8. CI 1 left the area and drove to a pre-determined location with TFO La Valley, SA Crocker, and TFO VanKuren following CI 1. CI 1 arrived at the pre-determined location and turned over the methamphetamine, heroin and fentanyl he/she bought from NORWOOD. CI 1 and CIV were searched by TFO La Valley for contraband with negative results. CI 1 turned over the video/audio recording device.

8

9. The suspected narcotics were weighed and were determined to be approximately 57.2 grams of methamphetamine, 29.1 grams of fentanyl, and 29.1 grams of heroin. A field test of the methamphetamine was conducted and showed a positive indication for the presence of methamphetamine.



10. On October 24, 2023, TFO La Valley, SA Crocker and TFO Van Kuren met with CI 1 and a second confidential, credible, and compensated ATF informant (hereinafter referred to as CI 2) in a pre-determined location. I have found CI 2 to be reliable and credible through previously investigations.

11. Prior to the operation, the CI's and the CIV were searched by TFO La Valley for contraband with negative results. CI 1 was provided with prerecorded Agent Cashier Funds to conduct the controlled buy for methamphetamine The CIs also received video/audio recording devices to capture any interaction the CIs had with subjects at the aforementioned location.

12. Once assisting officers were in the area of 120 Yester Oaks Way E, Apartment F, Greensboro NC to conduct surveillance, TFO La Valley, SA

9

Crocker and TFO Van Kuren instructed CI 1 and CI 2 to respond together in the aforementioned CIV to 120 Yester Oaks Way E, Apartment F, Greensboro NC to purchase one-half pound of methamphetamine from NORWOOD.

13. After CI 1 and CI 2 arrived at 120 Yester Oaks Way E, Greensboro NC, CI 1 went to the front door of Apartment F and knocked. CI 2 remained in the CIV. NORWOOD opened the front door to apartment "F" and allowed CI 1 into the apartment. NORWOOD and CI 1 spoke briefly during which time NORWOOD was provided one thousand one hundred dollars ($1100.00) of prerecorded Agent Cashier Funds for approximately 227 grams of methamphetamine. During the transaction, a black in color handgun, US Currency, and a digital scale with apparent narcotics on was observed on video surveillance on top of the kitchen counter.





14. CI 1 left the apartment and returned to the CIV where CI 2 was. The CI's left the area and drove to a pre-determined location with TFO La Valley, SA Crocker, and TFO VanKuren following the CI's. The CI's arrived at the pre-determined location and the purchased methamphetamine was seized. CI 1, CI 2, and the CIV were searched by TFO La Valley for contraband with negative results. CI 1 and CI 2 turned over the video/audio recording device.

15. The suspected narcotics were weighed and was determined to be approximately 227grams of methamphetamine. A field test of the methamphetamine was conducted and showed a positive indication for the presence of methamphetamine.



16. On November 22, 2023, TFO La Valley and TFO Van Kuren met with the CI 2 in a pre-determined location and directed CI 2 to respond to 120 Yester Oaks Way E, Greensboro NC to meet with NORWOOD and purchase one pound of methamphetamine. CI 2 was provided with prerecorded Agent Cashier Funds to conduct the controlled buy for methamphetamine.

17. Prior to the operation, CI 2 and the CIV were searched by TFO La Valley for contraband with negative results. CI 2 also received a video/audio recording device to capture any interaction the CI 2 has with subjects at the aforementioned location.

18. Once assisting officers were in the area of 120 Yester Oaks Way E, Greensboro NC to conduct surveillance, TFO La Valley and TFO Van Kuren instructed CI 2 to respond to 120 Yester Oaks Way E, Greensboro NC.

19. After CI 2 arrived at 120 Yester Oaks Way E, Greensboro NC, NORWOOD was observed walking from the breezeway of 120 Yester Oaks Way E, and enter the CIV.

12



20. The two spoke briefly, during which time CI 2 gave NORWOOD two thousand four hundred dollars ($2400.00) of prerecorded Agent Cashier Funds for approximately 471 grams of methamphetamine. NORWOOD then exited the CIV.



21. CI 2 left the area and drove to a pre-determined location with TFO La Valley and TFO VanKuren following CI 2. Officers conducting surveillance observed NORWOOD return to the breezeway of 120 Yester Oaks Way E. As officers drove past the breezeway, they observed NORWOOD exiting 120 Yester Oaks Way E, Apartment F and walking toward the apartment with a bag of apparent garbage.

13

22. CI 2 arrived at the pre-determined location and the purchased methamphetamine was seized. CI 2 and the CIV were searched by TFO La Valley for contraband with negative results. The video/audio recording device was recovered from CI 2.

23. The suspected narcotics were weighed and were determined to be approximately 471 grams of methamphetamine. A field test of the methamphetamine was conducted and showed a positive indication for the presence of methamphetamine.



24. On February 15, 2024, TFO La Valley and TFO Van Kuren met with the CI 1 in a pre-determined location and directed CI 1 to contact NORWOOD to determine what location NORWOOD wanted to meet to purchase one pound of methamphetamine. CI 1 call NORWOOD and NORWOOD told CI 1 to meet at 1700 Stanley Road, Greensboro NC to purchase one pound of methamphetamine. CI 1 was provided with prerecorded Agent Cashier Funds to conduct the controlled buy for methamphetamine.

25. Surveillance was set up in the area of 1700 Stanley Road Suite E, Greensboro NC, which is the location of the "Winston-Salem Barber School".

26. During the surveillance, SA Underhill observed NORWOOD arrive in the parking lot as a passenger in a silver in color Nissan Rogue, bearing NC registration FJB2468. NORWOOD and the driver of the Nissan Rogue exited the vehicle. The driver was identified as a black male with braids, and that male walked to and entered the Winston-Salem Barber School carrying a plastic bag, appearing to be containing food. After NORWOOD exited the Nissan Rogue, he immediately went to a white in color Chevrolet Sonic, bearing NC registration JLX6983, that was parked next to the Nissan Rogue. NORWOOD opened the front door to the vehicle and leaned into the vehicle, exited the vehicle, and shut the vehicle door. NORWOOD then walked into the Winston-Salem Barber School.

27. A query through NC DMV revealed the Chevrolet Sonic to be registered to Bel Aire Used Car Rental, located at 3330 N Patterson Avenue, Winston-Salem, NC.





28. TFO La Valley and TFO VanKuren searched CI 1 and the CIV, no

    contraband was located.

29. CI 1 left the area and drove to a pre-determined location with TFO La Valley

    and TFO VanKuren following CI 1.

16

30. Officers conducting surveillance observed NORWOOD exit the Winston-Salem Barber School and walking to the parked Chevrolet Sonic, opening a back passenger door of the Chevrolet Sonic (NC registration JLX6983), and retrieving a plastic bag from the vehicle. NORWOOD shut the door to the Chevrolet Sonic and sat in the CIV. Once in the CIV, CI gave NORWOOD $1,750 of ATF Agent Cashier Funds for approximately 454 grams of methamphetamine.



31. While inside the CIV, NORWOOD advised "I got a few more of them shits" and stated he could do "sixteen five" ($1650). TFO La Valley knows from his training and experience that NORWOOD was stating he had a "few more" pounds of methamphetamine and could lower his price to $1,650 per pound for future transactions.

17

32. NORWOOD exited the CIV and went back into the Winston-Salem Barber Shop and CI 1 departed from 1700 Stanley Rd, Greensboro, NC. Surveillance units remained in the area maintaining visual surveillance on the Barber Shop and the Chevrolet Sonic.

33. At approximately 1:29pm, TFO La Valley and TFO VanKuren met CI 1 at a predetermined location. The recording devices were then turned off. TFO La Valley recovered the purchased narcotics from CI 1. CI 1 and the CIV were again searched with negative result for any contraband.

34. Surveillance was maintained at the Barber Shop, during which NORWOOD was observed exiting the business. NORWOOD entered the driver's seat of the Chevrolet Sonic (NC registration JLX6983) and drove the vehicle from the parking lot. NORWOOD was the only occupant of the Chevrolet Sonic.

35. NORWOOD drove to 1622 Stanley Road, parked in the parking lot and entered the business (Foggy Zone Tobacco and Vape). NORWOOD exited the business approximately one minute later, entered the Chevrolet Sonic and drove north on Stanley Road.

36. NORWOOD was followed to the area of 437 Guilford College Road (Ashley Oakes Apartments), where he was observed parking the Chevrolet Sonic in the parking lot. NORWOOD walked to the playground where there were multiple small children. NORWOOD interacted with the children and a black female for a few minutes, after which NORWOOD returned to the parked Chevrolet Sonic.

18

37. NORWOOD entered the Chevrolet Sonic and drove from the area. NORWOOD was again followed by TFO's and SA's. NORWOOD drove directly to 120 Yester Oaks Way E, Greensboro NC, and parked in front of the building. NORWOOD was then observed exiting the vehicle carrying a small box and walking to apartment "F" and entering the apartment.

38. The suspected narcotics were weighed and were determined to be approximately 454.6 grams of methamphetamine. A field test of the methamphetamine was conducted and showed a positive indication for the presence of methamphetamine.



## CONCLUSION

39. It is believed that the facts alleged herein establish the following:

a.) that the target of this investigation is engaged in long-term, continuing criminal activities, namely offenses involving the distribution and possession with intent to distribute Methamphetamine, in violation of Title 21,

United States Code, Section 841(a)(1) and Title 21, United States Code 841(b)(1)(c) and the distribution and possession with intent to distribute fentanyl, in violation of Title 21, United States Code, Section 841(a)(1) and Title 21, United States Code 841(b)(1)(c);

      b.) that the evidence sought through the use of a search warrant listed herein will provide Probable Cause to enter house and arrest him,

      c.) investigators with admissible evidence of these crimes needed to establish the full scope and nature of the offenses being investigated; including determining the identity of members of the organization, the sources of supply, transportation methods, locations used to conceal drugs and the assets purchased from the proceeds derived from the sale of drugs, firearms; and,

d.) that there is probable cause to believe that such items of evidence, which represent the fruits and instrumentalities of said offenses, will be located within the location specified in this application which is located within the Middle District of North Carolina.

/s/ Matthew La Valley

Matthew La Valley

Task Force Officer

Alcohol, Tobacco, Firearms and Explosives

On this day, the applicant appeared before me via reliable electronic means, that is by telephone, was placed under oath, and attested to the contents of this written affidavit in accordance with the requirements of Fed. R. Crim. P. 4.1.

Date: February 21, 2024  4:10 pm

City and State: Durham, North Carolina

Hon. Joe L. Webster
UNITED STATES MAGISTRATE JUDGE
MIDDLE DISTRICT OF NORTH CAROLINA

## Attachment A

The entire premises located at 120 Yester Oaks Way E, Apartment F, Greensboro NC 27455.  The residence is described as a two-level apartment building with six units associated with the building, with three apartments downstairs and three apartments upstairs. The building number "120" is located on the southeast facing exterior wall of the apartment building. There is a common exterior breezeway for the apartments, with a staircase located at both the north and the south end of the breezeway. Apartment "F" is located upstairs and the letter "F" is located on the front door of the apartment.



# APPLICATION FOR SEARCH WARRANT

## ATTACHMENT B

### Items to be Seized:

The following materials, which constitute evidence of the commission of a criminal offense, contraband, the fruits of crime, or property designed or intended for use or which is or has been used as the means of committing a criminal offense, namely violations of in violation of Title 21, United States Code, Section 841(a)(1) and Title 21, United States Code 841(b)(1)(c) including:

        a.)  books, records, receipts, notes, ledgers, airline tickets, money orders, pagers, scanners, cellular telephones and other instruments and papers relating to transportation, ordering, distribution, and sale of controlled substances;

        b.)  contraband proceeds of drug sales including official government funds used to make controlled purchases and records of drug transactions;

        c.)  currency, financial instruments, precious metals, jewelry, and other items of value representing proceeds of drug transactions;

        d.)  securities, cashier's checks, money drafts, wire transfers, letters of credit, bank statements, real estate documents;

        e.)  names, addresses or telephone numbers in books, ledgers, electronics storage devices or on papers which reflect the names, nicknames, code names, addresses, and/or the telephone numbers of criminal associates;

        f.)  photographs or other video images depicting drug related activity or possession of firearms;

        g)  paraphernalia used for the packaging, diluting, weighing and/or distribution of drugs, including, but not limited to:  scales, plastic bags, diluting agents, tape, plastic wrap, and other items used to conceal drugs during transportation such as chemical and other odor-masking agents;

        h.)  paraphernalia used to count and package currency, including, but not limited to money counting machines, plastic wrap, bulk quantities of rubber bands, and other items used to conceal drug proceeds such as chemical and other odor-masking agents;

        i.)  firearms, ammunition, and firearms accessories;

PAGE 1 OF 1

j.) controlled substances, to include but not limited to methamphetamine, cocaine and "crack" cocaine;

k.) any indicia of ownership or occupancy of the premises to be searched.

l.) automobiles located at the residence